ELIZABETH KERR, JUSTICE
We have two issues to address: (1) whether the trial court correctly determined that the availability of class-action arbitration under the parties' contract was a gateway substantive issue for it, not the arbitrator, to decide; and (2) whether the trial court correctly ruled that the arbitration clause in question did not authorize class arbitration. We hold that the trial court was right on both issues, and so we affirm.
Background
In February 2015, Nathan and Misti Robinson-in only their individual capacities-sued Home Owners Management Enterprises, Inc. d/b/a Home of Texas (HOME) and Warranty Underwriters Insurance Company (WUIC), along with others not parties to this appeal, for failure to fix or repair defects, for poor construction, and for deficiencies in their new home. At HOME's request, the trial court abated the case and ordered arbitration based on an arbitration agreement contained in a Limited Warranty and its associated Addendum that HOME had provided to the Robinsons.[1]
Section IV.E of the Limited Warranty is entitled "Arbitration" and reads, in part:
You begin the arbitration process by giving the Administrator written notice of your request for arbitration of an Unresolved Warranty Issue. Within twenty (20) days after the Administrator's receipt of your notice of request for arbitration, any Unresolved Warranty Issue that you have with the Warrantor shall be submitted to an independent arbitration service experienced in arbitrating residential construction matters upon which you and the Administrator agree. This binding arbitration is governed by the procedures of the Federal Arbitration Act, 9 U.S.C. 1, et seq. ... [Emphases in original.]
The Addendum contains similar language in its section IV.A: "All Unresolved Warranty Issues will be submitted to binding arbitration. The Arbitrator shall be an independent Arbitrator or arbitration service upon which you and HOME agree.
*229 This binding arbitration is governed by the procedures of the Federal Arbitration Act, 9 U.S.C. 1 et seq ...."
Both the Limited Warranty and the Addendum define an "Unresolved Warranty Issue" similarly; we include within brackets the Addendum's phrasing, where different:
All requests for warranty performance, demands, disputes, controversies and differences that may arise between the parties to this Limited Warranty [to this TRCC Addendum as set forth in Section III hereof] that cannot be resolved among the parties. An Unresolved Warranty Issue may be a disagreement regarding:
a. the coverages in this Limited Warranty [in this TRCC Addendum to the Limited Warranty];
b. an action performed or to be performed by any party pursuant to this Limited Warranty [to this TRCC Addendum to the Limited Warranty];
c. the cost to repair or replace any item covered by this Limited Warranty [by this TRCC Addendum to the Limited Warranty].
The Addendum adds a fourth category of disagreement: "d. any other complaint or controversy regarding this TRCC Addendum between the parties to this Addendum."
Neither the Limited Warranty nor the Addendum mentions class-based arbitration, nor does either one refer to or incorporate the rules of the American Arbitration Association or any other arbitration-industry group.
At the appointed arbitrator's and the parties' joint request, in July 2015 the trial court ordered that arbitration of the Robinsons' claims be completed no later than February 12, 2016. By agreement among themselves, the arbitrator and the parties had arranged a property inspection for February 1 and had set aside February 2nd through 4th to arbitrate.
On January 8, 2016-fewer than thirty days before the scheduled arbitration and almost a year after they had sued HOME-the Robinsons submitted to the arbitrator their "First Supplement to Plaintiffs' First Amended Statement of Claims as Representatives of All Persons Similarly Situated as to [HOME]." Through this supplement, the Robinsons sought for the first time to add class-action allegations against HOME over its alleged practice of wrongly requiring homeowners to execute overbroad releases as a condition of HOME's performing repairs on covered claims. This allegation was unrelated to and independent of the Robinsons' claims regarding defective construction of their own house.
Eleven days later, on January 19, HOME objected and moved to strike the Robinsons' new class allegations. Although with his later January 28 order the arbitrator declined to strike the Robinsons' supplemental claims, the arbitrator did bifurcate those claims from the Robinsons' individual construction-related claims already set for February 2, 2016.
In early March 2016, after completing the arbitration but before the arbitrator issued his decision, HOME asked the trial court, "per the suggestion of the Arbitrator," to clarify the "scope of the issues subject to" the court's July 2015 arbitration order or, alternatively, to strike the Robinsons' class claims. A little more than two weeks later, the arbitrator ruled entirely in the Robinsons' favor on their individual claims.
Having been awarded their costs of repairs, expert fees, arbitration costs, and contract-related attorney's fees in arbitration, *230 the Robinsons returned to the trial court in April 2016 with a "Statement of Claims, Individually and as Representatives of All Persons Similarly Situated," reiterating their complaints about HOME's demanding overbroad releases before making covered repairs. And in an about-face from their earlier resistance to arbitration, the Robinsons now asserted that HOME was bound to arbitrate the class claims.
In moving the trial court to deny the Robinsons' demand for class arbitration and to strike or dismiss their new statement of claims, HOME argued as an overarching matter that the parties "never agreed to the unusual and impractical dispute resolution mechanism of class arbitration." After conducting a nonevidentiary hearing, the trial court found the following:
1. The question of whether the parties agreed to class arbitration is a question of arbitrability for this Court.
2. The Parties did not "clearly and unmistakably" provide that the arbitrator is to decide issues of arbitrability; thus, this Court shall determine the issue of class arbitrability.
3. The Court determines and finds that the Warranty Agreement between the Parties does not permit class arbitration.
As a result, the trial court granted HOME's motion in part, ordering that "[t]his matter shall not be referred to class arbitration."[2] The Robinsons appealed this interlocutory order in accordance with Texas Civil Practice & Remedies Code section 51.016, which gives us jurisdiction.[3]
Discussion
Standard of review
The Robinsons frame two issues for us: (1) "Did the trial court abuse its discretion by deciding the question of arbitrability of [their] class claims rather than the arbitrator?" and (2) "Did the trial court abuse its discretion by determining the class claims are not arbitrable?" With these characterizations, the Robinsons correctly acknowledge that we review for abuse of discretion orders denying arbitration. Denar Rests., LLC v. King , No. 02-13-00142-CV, 2014 WL 2430854, at *2 (Tex. App.-Fort Worth May 30, 2014, no pet.) (mem. op.); D.R. Horton-Texas, Ltd. v. Drogseth , No. 02-12-00435-CV, 2013 WL 3377121, at *1 (Tex. App.-Fort Worth July 3, 2013, no pet.) (mem. op.); Cleveland Constr., Inc. v. Levco Constr., Inc. , 359 S.W.3d 843, 851 (Tex. App.-Houston [1st Dist.] 2012, pet. dism'd). As part of our evaluation, we defer to any factual determinations that are *231 supported by the record but review legal questions de novo. See, e.g. , Denar Rests. , 2014 WL 2430854, at *2. The trial court here did not conduct an evidentiary hearing, nor did it enter findings of fact and conclusions of law, and so for all practical purposes, our review is de novo. If we conclude that the trial court "refuse[d] to compel arbitration under a valid and enforceable arbitration agreement," then it "clearly abused its discretion." In re Odyssey Healthcare, Inc. , 310 S.W.3d 419, 422 (Tex.) (orig. proceeding), cert. denied , 562 U.S. 895, 131 S.Ct. 319, 178 L.Ed.2d 145 (2010).
For the reasons that follow, we find no error in the trial court's decisions.
General principles concerning arbitration agreements
In disputes that are subject to the Federal Arbitration Act, courts universally agree with certain principles:
• Agreements, such as this one, that are governed by the FAA are considered "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2 (West 2009).
• As an "overarching principle," then, "arbitration is a matter of contract." See, e.g. , Am. Exp. Co. v. Italian Colors Rest. , 570 U.S. 228, 233, 133 S.Ct. 2304, 2309, 186 L.Ed.2d 417 (2013) (citing Rent-A-Center, W., Inc. v. Jackson , 561 U.S. 63, 67, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010) ).
• From basic contract notions it thus follows that arbitration "is a matter of consent, not coercion." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp. , 559 U.S. 662, 681, 130 S.Ct. 1758, 1773, 176 L.Ed.2d 605 (2010) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ. , 489 U.S. 468, 479, 109 S.Ct. 1248, 1256, 103 L.Ed.2d 488 (1989) ).
• Substantive questions of arbitrability-including "whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy," Green Tree Fin. Corp. v. Bazzle , 539 U.S. 444, 452, 123 S.Ct. 2402, 2407, 156 L.Ed.2d 414 (2003) -are presumptively questions "for judicial determination unless the parties clearly and unmistakably provide otherwise," Howsam v. Dean Witter Reynolds, Inc. , 537 U.S. 79, 83, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002) (cleaned up).
Issue One: If a contract doesn't say, who decides whether class claims are arbitrable, a court or an arbitrator?
Cases in which one signatory to a bilateral arbitration agreement seeks to compel (or to resist) arbitration of claims between the two signatory parties are relatively easy and lend themselves to straightforward contract-construction principles. Less clear-cut are situations in which one party to a bilateral agreement that is silent about class arbitration seeks to compel its counterparty to arbitrate class claims, although the clear trend is that, because of significant differences between bilateral and class arbitration, it is appropriate for courts to rule on this gateway issue.
A. Federal law.[4]
Following the United States Supreme Court's 2003 plurality opinion in *232 Bazzle dealing with-but not actually deciding by a majority-whether the availability of class arbitration is a substantive matter for the court or a procedural one for the arbitrator, many courts have struggled with what to make of that case. Indeed, over the past 15 years the Supreme Court has twice overtly distanced itself from the Bazzle plurality's idea that class arbitration involves the kinds of things routinely left to the arbitrator, such as simple matters of "contract interpretation and arbitration procedures." 539 U.S. at 453, 123 S.Ct. at 2407.
First, in 2010, the Court expressed dismay that the parties before it in Stolt-Nielsen "appear[ed] to have believed that the judgment in Bazzle requires an arbitrator, not a court, to decide whether a contract permits class arbitration." 559 U.S. at 680, 130 S.Ct. at 1772. Not so: "In fact, however, only the [ Bazzle ] plurality decided that question." Id. at 680, 130 S.Ct. at 1772. Although Stolt-Nielsen 's procedural posture did not tee up the issue, the Court laid out in some detail the competing views within the Bazzle Court on the "who decides" question, prefacing its discussion by noting that "no single rationale" for the opinion as a whole "commanded a majority." Id. at 678-79, 130 S.Ct. at 1771-72.
Three years later, the Court decided Oxford Health Plans LLC v. Sutter , 569 U.S. 564, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013). Because the parties there had agreed beforehand to let the arbitrator decide whether their contract authorized class arbitration, the "who decides" question was not up for judicial determination. The Oxford Health Court simply upheld the arbitrator's interpretation as permitting class arbitration, applying the unremarkable principle that courts cannot override even a mistaken interpretation so long as the arbitrator did his or her job by construing the contract in the first place:
All we say is that convincing a court of an arbitrator's error-even his grave error-is not enough. So long as the arbitrator was "arguably construing" the contract-which this one was-a court may not correct his mistakes under § 10(a)(4) [of the FAA]. The potential for those mistakes is the price of agreeing to arbitration.... The arbitrator's construction holds, however good, bad, or ugly.
Id. at 572-73, 133 S. Ct. at 2070-71 (citations omitted).
The Court nevertheless included a footnote that many, now including us, have interpreted as the clearest signal that Bazzle might not be long for this world, even in its weak-tea plurality form:
We would face a different issue if Oxford had argued below that the availability of class arbitration is a so-called "question of arbitrability." Those questions-which "include certain gateway matters, such as whether parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy"-are presumptively for courts to decide. [Quoting Bazzle , 539 U.S. at 452, 123 S.Ct. at 2407.] A court may therefore review an arbitrator's determination of such a matter de novo absent "clear[ ] and unmistakabl[e]" evidence that the parties wanted an arbitrator to resolve the dispute. AT&T Technologies, Inc. v. Communications Workers , 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed. 2d 648 (1986).
*233 Id. at 569 n.2, 133 S. Ct. at 2068 n.2. The footnote continued: " Stolt-Nielsen made clear that this Court has not yet decided whether the availability of class arbitration is a question of arbitrability." Id. at 569 n.2, 133 S.Ct. at 2068 n.2.
Justice Alito concurred, adding that if the Court were reviewing the arbitrator's decision de novo, it "would have little trouble concluding that [the arbitrator] improperly inferred '[a]n implicit agreement to authorize class-action arbitration ... from the fact of the parties' agreement to arbitrate.' " Id. at 574, 133 S.Ct. at 2071 (Alito, J., concurring) (quoting Stolt-Nielsen , 559 U.S. at 685, 130 S.Ct. at 1775 ).
Since Oxford Health , several federal circuits have weighed in on the "who decides" question, with all save one[5] taking the Supreme Court's hint. The first was the Sixth Circuit later the same year, with Reed Elsevier, Inc. v. Crockett , 734 F.3d 594 (6th Cir. 2013), cert. denied , --- U.S. ----, 134 S.Ct. 2291, 189 L.Ed.2d 173 (2014). There, the putative class representative, Crockett, filed on behalf of two proposed classes an arbitration demand with the American Arbitration Association against LexisNexis, a Reed Elsevier business division, concerning LexisNexis's billing practices. Id. at 596. LexisNexis responded with a declaratory-judgment action in federal district court seeking a ruling that the parties' contract did not authorize class arbitration. Id.
In affirming summary judgment in LexisNexis's favor, the Sixth Circuit first distinguished between "gateway disputes" that are presumptively left to courts unless the parties have "clearly and unmistakably provide[d] otherwise," and "subsidiary questions" that arbitrators presumptively decide. Id. at 597. A gateway dispute includes such matters as "whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." Id. (quoting Bazzle , 539 U.S. at 452, 123 S.Ct. at 2407 ). A subsidiary question, in contrast, involves such things as "waiver, delay, or whether a condition precedent to arbitrability has been fulfilled." Id. (quoting Howsam , 537 U.S. at 84-85, 123 S.Ct. at 592 ) (cleaned up).[6]
Having set the stage, the Sixth Circuit then got to the issue before it: "whether classwide arbitrability is a gateway question or a subsidiary one." Id. Crockett urged the latter view, relying on Bazzle 's plurality opinion that classwide arbitrability is a subsidiary matter because rather than considering whether the parties "agreed to arbitrate a matter," the question was instead "what kind of arbitration proceeding the parties agreed to." Id. (quoting Bazzle , 539 U.S. at 452, 123 S.Ct. at 2407 ).
*234 But the Reed Elsevier Court ultimately held that the availability of classwide arbitration is in fact a gateway issue for the court, first observing that "[a]lthough the Supreme Court's puzzle of cases on this issue is not yet complete, the Court has sorted the border pieces and filled in much of the background":
As an initial matter, the Court has pointedly observed that "only the plurality" in Bazzle decided whether classwide arbitrability is a gateway question. [Citing and quoting Stolt-Nielsen , 559 U.S. at 680, 130 S.Ct. at 1772.] And just last Term, the Court flatly stated that it "has not yet decided whether the availability of class arbitration" is a gateway question. [Citing and quoting Oxford Health , 569 U.S. at 569 n.2, 133 S.Ct. at 2068 n.2.]
Id. at 597-98.
Concluding, then, that the question "remains an open one," the Sixth Circuit further noted that "for Crockett the caselaw is even worse than that-for recently the Court has given every indication, short of an outright holding, that classwide arbitrability is a gateway question rather than a subsidiary one." Id. at 598. For this proposition, the court quoted not only Stolt-Nielsen 's caution against presuming that a mere agreement to arbitration subsumes a further agreement to classwide arbitration, but also AT & T Mobility LLC v. Concepcion , 563 U.S. 333, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), a case holding that the FAA preempted California law that refused to honor arbitration clauses' class-action waivers under certain circumstances. That is, the Supreme Court found that effectively requiring class arbitration by finding a waiver provision unconscionable under California law "interferes with fundamental attributes of arbitration" such as its "streamlined procedures." Id. at 344, 131 S.Ct. at 1748.[7]
To further support its holding, the Sixth Circuit quoted portions of Stolt-Nielsen , Concepcion , and Oxford Health to round up the "fundamental" differences, of which there are at least four, between bilateral and classwide arbitration:
• Although the purpose of arbitration is to be low-cost, efficient, and speedy, those benefits are "much less assured" when it comes to classwide arbitration, thus casting doubt on parties' mutual consent to that procedure;
• Parties in bilateral arbitration expect a certain level of confidentiality, but class arbitration can inject confidentiality-related uncertainties that the parties might not have anticipated;
• The commercial stakes of classwide arbitration are comparable to those of class-action litigation even though the scope of judicial review is much more limited; and
• Due-process concerns arise where class arbitration purports to adjudicate the rights of absent class members, *235 and so absent parties must be given the usual notice and opt-out rights; indeed, without requiring class members to affirmatively opt in, serious questions exist about whether class arbitration can bind absent members who have not consented to that procedure.
See 734 F.3d at 598 (citing and quoting Oxford Health , 569 U.S. at 574-75, 133 S.Ct. at 2071-72 (Alito, J., concurring); Concepcion , 563 U.S. at 347-50, 131 S.Ct. at 1750-52 ; Stolt-Nielsen , 559 U.S. at 685, 686-87, 130 S.Ct. at 1775-76 ). Summing up, the Sixth Circuit ended this section of its opinion with Justice Scalia's pithy observation from his Concepcion majority opinion: "Arbitration is poorly suited to the higher stakes of class litigation." Id. (quoting Concepcion , 563 U.S. at 350, 131 S.Ct. at 1752 ).
For all those reasons the court found that, in contrast to gateway questions, subsidiary (or procedural) questions merely "concern details"-and "whether the parties arbitrate one claim or 1,000 in a single proceeding is no mere detail." Id. at 598. Put simply (and sensibly), "whether the parties agreed to classwide arbitration is vastly more consequential than even the gateway question whether they agreed to arbitrate bilaterally." Id. at 599.
Two decisions from the Third Circuit, in 2014 and then in 2016, similarly concluded that the availability of class-based arbitration is a gateway question of arbitrability for a court to answer. See Opalinski v. Robert Half Int'l Inc. , 761 F.3d 326, 335 (3rd Cir. 2014), cert. denied , --- U.S. ----, 135 S.Ct. 1530, 191 L.Ed.2d 558 (2015) ("The [Supreme] Court's line of post- Bazzle opinions ... indicates that, because of the fundamental differences between classwide and bilateral arbitration, and the consequences of proceeding with one rather than the other, the availability of classwide arbitrability is a substantive gateway question rather than a procedural one. We thus join the Sixth Circuit Court of Appeals in holding that the availability of class arbitration is a 'question of arbitrability' "; courts, not arbitrators, must presumptively decide arbitrability questions unless parties "clearly and unmistakably" provide otherwise, and the "burden of overcoming the presumption is onerous"); see also Chesapeake Appalachia, LLC v. Scout Petroleum, LLC , 809 F.3d 746, 754-58 (3rd Cir.), cert. denied , --- U.S. ----, 137 S.Ct. 40, 196 L.Ed.2d 27 (2016) (same).
The Fourth Circuit was the next to adopt this view, later in 2016. See Dell Webb Cmtys., Inc. v. Carlson , 817 F.3d 867, 877 (4th Cir.), cert. denied , --- U.S. ----, 137 S.Ct. 567, 196 L.Ed.2d 444 (2016) (holding that where the "parties did not unmistakably provide that the arbitrator would decide whether their agreement authorizes class arbitration," the question was a substantive one for the court). And just last year, the Eighth Circuit followed suit. See Catamaran Corp. v. Towncrest Pharmacy , 864 F.3d 966, 969, 971-73 (8th Cir. 2017) (same).
As the most recent pronouncement from a federal appellate court, the Eighth Circuit's Catamaran decision recapped what has happened post- Bazzle , reiterated the core distinctions between bilateral and class arbitration that were earlier collected in Reed Elsevier , and drew this conclusion:
After considering all of these fundamental differences, we conclude that the question of class arbitration belongs with the courts as a substantive question of arbitrability. See Carlson , 817 F.3d at 877 ; Opalinski [, 761 F.3d at 334 ]; Crockett , 734 F.3d at 599. The answer to this question will change the very nature of the underlying controversy. For "whether the parties arbitrate one claim or 1,000 in a single proceeding is no mere *236 detail." Crockett , 734 F.3d at 598. And questions concerning "whether the parties have submitted a particular dispute to arbitration" presumptively lie with the court. See Howsam , 537 U.S. at 83, 123 S.Ct. 588.
864 F.3d at 972.
This, even though the agreement at issue in Catamaran had expressly incorporated the rules of the American Arbitration Association, a fact that many courts have found tantamount to a "clear and unmistakable indication that the parties intended for an arbitrator to decide substantive [gateway] questions of arbitrability."[8] Id. at 973. Nonetheless, the Eighth Circuit limited this delegation of substantive questions to the bilateral-arbitration context, finding that incorporating AAA rules by reference is "insufficient evidence that the parties intended for an arbitrator to decide the substantive question of class arbitration." Id.
Why? Because "[t]he risks incurred by defendants in class arbitration (bet-the-company stakes without effective judicial review, loss of confidentiality)" as well as the "difficulties presented by class arbitration (due process rights of absent class members, loss of speed and efficiency, increase in costs)," combine to "demand a more particular [that is, a clear and unmistakable] delegation of the issue than we may otherwise deem sufficient in bilateral disputes." Id.
The Fifth Circuit currently stands alone among the federal circuits in holding otherwise. See J & K Admin. Mgmt. Servs. , 817 F.3d 193. Even so, its latest word in this area was grounded not on any conviction that Bazzle is good law but on its deference, under the circuit's rule of orderliness, to an earlier and concededly flawed Fifth Circuit precedent.[9] Id. at 197 (citing Pedcor Mgmt. Co. Inc. Welfare Benefit Plan v. Nations Pers. of Tex., Inc. , 343 F.3d 355 (5th Cir. 2003), and noting that *237 Stolt-Nielsen did not expressly overrule the 2003 Bazzle decision, on which Pedcor had been based later that same year).
In fact, the J & K Court candidly acknowledged that its conclusion in Pedcor -that the Bazzle plurality plus Justice Stevens's concurrence added up to a majority holding that an arbitrator should decide the class-arbitrability issue-was "not accurate." Id. at 196. But because Stolt-Nielsen did not "fundamentally alter the focus of the analysis of when to submit questions of class or collective arbitrability to arbitration," the Fifth Circuit "continue[s] to be bound by Pedcor Management under the rule of orderliness." Id. at 197. Given the lack within the J & K opinion of any substantive analysis, much less any disagreement with its sister circuits on the "who decides" issue, the J & K holding is hardly a ringing endorsement for delegating the question to an arbitrator as a sound or defensible legal principle.[10]
All in all, we are persuaded that the Third, Fourth, Sixth, and Eighth Circuits[11] have it right in leaving the "who decides" question to the courts when an arbitration agreement is silent about class arbitration one way or another. We are also persuaded that the United States Supreme Court has effectively abrogated Bazzle 'splurality conclusion by its later majority opinions, which-although not squarely deciding the question-contain thoughtful and prudential discourses about the pros and cons of classwide arbitration. From those discourses, we glean that the issue is in fact presumptively reserved for the courts as a gateway matter.
B. Texas law.
The Texas Supreme Court has written on this issue only once, a scant year after Bazzle and long before doubts about both its binding effect and the soundness of the plurality's analysis began to arise. See In re Wood , 140 S.W.3d 367 (Tex. 2004) (orig. proceeding) (per curiam) (holding that a lawyer's fee agreements with thousands of breast-implant clients, which stated that all disputes arising out of the fee agreement would be arbitrated, delegated class-certification issues arising from post-settlement fee disputes to an arbitrator). Reading Bazzle as having definitively settled the "who decides" question, the court observed that the high court had "held that, where parties agreed to submit all disputes to an arbitrator under the Federal Arbitration Act, issues of class arbitration are for the arbitrator to decide." Id. at 368 (emphasis added). In a two-and-a-half-page decision in that mandamus proceeding, it thus reversed the appellate court's having directed the trial court rather than the arbitrator to rule on the class-certification issue. Id. at 369-70.
The Wood court did note Bazzle 's status as a plurality opinion, but quoted approvingly the Fifth Circuit's then-fresh Pedcor observation that "the plurality's governing rationale in conjunction with Justice Stevens' support of that rationale substantially guides our consideration of this dispute." Id. at 368 n.1 (quoting *238 Pedcor , 343 F.3d at 359 ). Of course, as we now know, the Fifth Circuit concedes that its earlier interpretation of Bazzle was "not accurate." J & K Admin. Mgmt. Servs. , 817 F.3d at 196.
Without the benefit of Stolt-Nielsen , Concepcion , and Oxford Health , and of federal appellate courts' additional analyses keying off those three cases, the Texas Supreme Court quite reasonably concluded and signaled-through its use in Wood of a routine per curiam disposition rather than an opinion-that "who decides" had been finally and actually decided.[12] But it had not.
More broadly, several years later our supreme court was called upon to decide whether an employment agreement (an "occupational injury plan") containing an arbitration clause bound a deceased employee's beneficiaries to arbitrate wrongful-death claims lodged against the employer. In re Labatt Food Serv., L.P. , 279 S.W.3d 640 (Tex. 2009) (orig. proceeding) (holding that arbitration clause bound third-party beneficiaries such as the plaintiffs because their wrongful-death claims were derivative of the decedent's rights, and decedent had contracted for binding arbitration). Couching the issue as "whether an arbitration agreement binds a nonsignatory," the Court recognized this as a "gateway matter to be determined by courts rather than arbitrators unless the parties clearly and unmistakably provide otherwise." Id. at 643 (citing Howsam , 537 U.S. at 83-84, 123 S.Ct. at 591-92 ; Weekley Homes , 180 S.W.3d at 130. Because the agreement at issue in Labatt Food Service was "silent about who is to determine whether particular persons are bound by the agreement," it was for a court to answer. Id. (citing First Options of Chicago, Inc. v. Kaplan , 514 U.S. 938, 944-45, 115 S.Ct. 1920, 1924-25, 131 L.Ed.2d 985 (1995) ).
Particularly in light of all the post- Bazzle reflection, we find it logical that this principle should similarly apply, at least by analogy, when it comes to putative class members who were of course "nonsignatories" of the Robinson-HOME Limited Warranty, and some of whom might well have individualized grounds for avoiding arbitration under their own bilateral Limited Warranties. See also In re Ford Motor Co. , 220 S.W.3d 21, 23-24 (Tex. App.-San Antonio 2006, orig. proceeding) (holding that arbitration clause providing that "any contests to the validity or enforceability" of the clause would be decided by arbitration governed by AAA rules did not mean that arbitrator rather than court should decide whether decedent's nonsignatory children and parents must arbitrate their claims). And as HOME points out, the Limited Warranty expressly allows homebuyers with VA or FHA financing to pursue "judicial resolution of disputes" "at any time during the dispute resolution process," thus creating a pool of warranty holders not bound to arbitrate even bilaterally, must less as part of a class.
Moreover, we have held, also in a non-class-action situation, that silence is not clear and unmistakable evidence of intent to delegate everything even where an arbitration agreement expressly incorporates AAA's Commercial Arbitration Rules, a fact that, as we noted earlier in this opinion, many courts use to hold that arbitrators *239 rather than courts get to decide gateway arbitrability questions. Haddock , 287 S.W.3d at 172-75 (holding that an agreement incorporating AAA rules did not delegate to an arbitrator the issue of alleged arbitration waiver through litigation conduct). We observed that "whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise," and that without such unmistakable contrary evidence, "it is the courts rather than the arbitrators that must decide gateway matters such as whether a valid arbitration agreement exists." Id. at 171-72 (cleaned up) (quoting Howsam , 537 U.S. at 83, 123 S.Ct. at 591 ; Weekley Homes , 180 S.W.3d at 130 ); but cf. Gilbert v. Rain & Hail Ins. , No. 02-16-00277-CV, 2017 WL 710702, at *4 (Tex. App.-Fort Worth Feb. 23, 2017, pet. denied) (mem. op.) (applying current version of AAA Rule 7(a) to hold that arbitrator could consider and overrule plaintiff's objections to arbitration).
In addition, we noted in Haddock that courts are careful not to "force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." 287 S.W.3d at 172 (quoting First Options , 514 U.S. at 944-45, 115 S.Ct. at 1924-25 ); cf. IHS Acquisition No. 131, Inc. v. Iturralde , 387 S.W.3d 785, 792-93 (Tex. App.-El Paso 2012, no pet.) (concluding that agreement providing that "any and all claims challenging the validity or enforceability of this Agreement" were subject to arbitration "clearly and unmistakably provided for [gateway] issues of validity and enforceability to go to the arbitrator").
With regard to Wood , we are of course mindful of stare decisis and of our obligations as a lower court. But our commitment is first and foremost to "follow the rule of law squarely decided by the Texas Supreme Court." First Nat'l Bank of Amarillo v. Arrow Oil & Gas, Inc. , 818 S.W.2d 159, 163 (Tex. App.-Amarillo 1991, no writ) (emphasis added); cf. Cervantes-Guervara v. State , 532 S.W.3d 827, 832 (Tex. App.-Houston [14th Dist.] 2017, no pet.) (noting that appellate courts are bound to follow Court of Criminal Appeals' decisions when that court has "deliberately and unequivocally interpreted the law"). Because Wood -which was based entirely on presumably binding authority that has since proved to be a chimera-thus did not really "squarely decide" this issue, we feel ourselves at greater liberty to anticipate what the court will ultimately conclude.
The Texas Supreme Court has noted that, as a general matter, stare decisis "dictates that once the Supreme Court announces a proposition of law, the decision is considered binding precedent," and that "[i]t is not the function of a court of appeals to abrogate or modify established precedent." Lubbock Cty. v. Trammel's Lubbock Bail Bonds , 80 S.W.3d 580, 585 (Tex. 2002). But the current state of the law on classwide arbitration leads us to believe that the Supreme Court (federal or state) has not, in fact, announced a legal proposition to which we must unhesitatingly assent. See NCP Fin. Ltd. P'ship v. Escatiola , 350 S.W.3d 152, 154-55 (Tex. App.-San Antonio 2011, no pet.) (suggesting, in dicta, that Stolt-Nielsen had undercut Bazzle and Wood ); but cf. Sam Houston Elec. Coop., Inc. v. Berry , No. 09-16-00346-CV, --- S.W.3d ----, ----, 2017 WL 4319849, at *6 (Tex. App.-Beaumont Sept. 28, 2017, no pet.) (in completely opposite procedural posture, citing Wood for the proposition that plaintiffs could not avoid arbitration by filing a lawsuit on behalf of a putative class). Moreover, stare decisis finds its "greatest force" in the area of statutory construction, something not here involved. See *240 Sw. Bell Tel. Co., L.P. v. Mitchell , 276 S.W.3d 443, 447 (Tex. 2008).
Additionally, when applying or interpreting federal law such as the FAA, our supreme court recognizes that it is in "the unique role-as a court of last resort on all other issues within our jurisdiction-of an intermediate appellate court, anticipating the manner in which the Unites States Supreme Court would decide the issue presented." City of Lancaster v. Chambers , 883 S.W.2d 650, 658-59 (Tex. 1994). When it comes to a court-versus-arbitrator prediction in the realm of deciding class-based arbitrability, the United States Supreme Court has made the eventual answer inescapable.
We thus hold that where a bilateral arbitration agreement says nothing about delegating the question of class-arbitration availability to an arbitrator, the judicial system retains its presumed role as the adjudicator of this substantive gateway issue. Put differently, an agreement's silence is simply not a clear and unmistakable delegation of such a fundamental issue.
We overrule the Robinsons' first issue.
Issue Two: Did HOME and the Robinsons contract for class-action arbitration?
Having concluded that the trial court properly assumed the role of "decider," we now turn to whether its decision was correct. It was, and so the trial court did not abuse its discretion.
Because arbitration agreements are contracts, they are interpreted using state law, although with the added gloss that "the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion[.]' " Stolt-Nielsen , 559 U.S. at 681, 130 S.Ct. at 1773 (quoting Volt Info. Scis. , 489 U.S. at 479, 109 S.Ct. at 1256 ); see also J.M. Davidson, Inc. v. Webster , 128 S.W.3d 223, 227 (Tex. 2003) ("Arbitration agreements are interpreted under traditional contract principles.").
We first look to an arbitration agreement's wording to see if the parties consented to a particular type of arbitration-that is, we look for the parties' intent within the agreement's plain language. Stolt-Nielsen , 559 U.S. at 681, 130 S.Ct. at 1773-74 ("[C]ourts and arbitrators must 'give effect to the contractual rights and expectations of the parties.' " (quoting Volt Info. Scis. , 489 U.S. at 479, 109 S.Ct. at 1256 ) ); see also Coker v. Coker , 650 S.W.2d 391, 393 (Tex. 1983) (stating that a court's "primary concern" is to "ascertain the true intentions of the parties as expressed in the instrument").
Additionally, Texas courts will look beyond a written agreement to imply some unexpressed term (such as, for example, an agreement to arbitrate class claims) only in the rarest of circumstances: An "implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it...." Danciger Oil & Ref. Co. of Tex. v. Powell , 137 Tex. 484, 154 S.W.2d 632, 635 (1941). Courts do not "rewrite contracts to insert provisions that the parties could have included, nor do courts imply restraints for which the parties did not bargain." LG Ins. Mgmt. Servs., L.P. v. Leick , 378 S.W.3d 632, 638 (Tex. App.-Dallas 2012, pet. denied) (citing Tenneco, Inc. v. Enter. Prods. Co. , 925 S.W.2d 640, 646 (Tex. 1996) ).
Concerning class arbitration in particular, in the same way that courts must find a clear and unmistakable indication within an arbitration agreement that *241 the parties intended for an arbitrator to decide gateway matters (as we explained in connection with the Robinsons' first issue), courts also must check to see if the agreement evinces a plain intent that class-based claims will be arbitrated. The United States Supreme Court made this abundantly clear in Stolt-Nielsen , when it held that a party "may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." 559 U.S. at 684, 130 S.Ct. at 1775 (emphasis in original). A corollary was the Court's holding that merely agreeing to arbitrate does not of itself subsume an agreement to arbitrate class-action claims:
An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator. In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes. But the relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration.
Id. at 685-86, 130 S. Ct. at 1775-76 (citations omitted); see also Reed Elsevier , 734 F.3d at 599 ("The principal reason to conclude that this arbitration clause does not authorize classwide arbitration is that the clause nowhere mentions it."); Romney v. Franciscan Med. Grp. , 199 Wash.App. 589, 399 P.3d 1220, 1226 (2017) ("We conclude that the agreements do not permit class arbitration because they are silent on the issue and we cannot infer consent to submit to class arbitration from silence," relying on Stolt-Nielsen and discussing Reed Elsevier ).
In line with these principles and authorities, we hold that because the Robinson-HOME Limited Warranty has not one word about class arbitration, the trial court correctly found that the parties did not agree to arbitrate any claims on a classwide basis.
Unable to cite to any language showing a "contractual basis for concluding that [HOME] agreed to" class arbitration ( Stolt-Nielsen , 559 U.S. at 684, 130 S.Ct. at 1775 ), the Robinsons posit the inverse, that the agreement "draws no distinctions between bilateral and class arbitration." But because of the significant differences between the two types, that is no reason for us to infer that HOME agreed to arbitrate the Robinsons' class-action claims against it. Doing so would run afoul both of Stolt-Nielsen and its progeny, and of basic Texas contract law.
The Robinsons also misconstrue Oxford Health in trying to refute HOME's argument that, as the Robinsons characterize it, "if class claims were subject to arbitration, then class arbitration would be specified and mentioned because the consequences for class arbitration are just too severe." As we have already discussed, the Oxford Health Court did not hold that a garden-variety arbitration clause implicitly covers class claims, but rather only that the court could not overturn the arbitrator's interpretation that the clause did allow for class arbitration-the parties there had agreed to let the arbitrator decide that issue, and under the FAA, "a court may not correct his mistakes." 569 U.S. at 572, 133 S.Ct. at 2070. Due to the parties'
*242 agreement to delegate the issue to the arbitrator, his "construction holds, however good, bad, or ugly." Id. at 573, 133 S.Ct. at 2071. The Robinsons have quoted isolated phrases from Oxford Health to contend that "like Oxford Health, because HOME 'chose arbitration' 'it must now live with that choice,' " but that case simply does not mean what the Robinsons would like for it to.
The same is true of their argument that we should construe the arbitration provision against HOME, its drafter. The rule of construing a contract against its drafter does not apply unless the contract is ambiguous, and only then as a "last resort" if all other canons of construction fail to yield a superlatively defensible interpretation. See, e.g. , Evergreen Nat'l Indem. Co. v. Tan It All, Inc. , 111 S.W.3d 669, 676-77 (Tex. App.-Austin 2003, no pet.). We do not think that the Limited Warranty's silence about class arbitration creates an ambiguity in need of contra proferentem or any other interpretative canon. See Hewlett-Packard Co. v. Benchmark Elecs., Inc. , 142 S.W.3d 554, 561 (Tex. App.-Houston [14th Dist.] 2004, pet. denied) (explaining difference between an ambiguous contract and one that is silent).
Similarly unavailing is the Robinsons' argument that because HOME insisted on a "broad, sweeping" view of the agreement when moving to compel bilateral arbitration of the Robinsons' individual claims, HOME is somehow now estopped from denying that its initial interpretation extended to class-based arbitration as well, or that it has waived the argument. But HOME could not have waived or estopped itself from resisting classwide arbitration prospectively and in a vacuum: the Robinsons had not pleaded for such a thing until long after the trial court had sent their bilateral claims to arbitration. We have no doubt that if the Robinsons had raised both individual and class claims at the outset, HOME's motion to compel arbitration would have looked completely different.
The trial court did not abuse its discretion by holding that the Limited Warranty does not permit class arbitration, and we thus overrule the Robinsons' second issue.
Conclusion
Having overruled the Robinson's two issues, we affirm the trial court's judgment.

The Robinsons paid for and received "The Limited Warranty" in connection with HOME's construction of their house, a warranty that was accompanied by a "TRCC Addendum to the Limited Warranty" provided by WUIC, a third-party underwriter. Unless we need to distinguish between them, we will refer to HOME and WUIC together as "HOME." In a 17-page response that attached nearly 200 pages of evidence, the Robinsons unsuccessfully fought HOME's motion to compel arbitration on a variety of grounds.

The trial court did not dispose of the Robinsons' new claims in any way beyond ruling that they were not arbitrable: "This Order is limited to determining arbitrability of class arbitration claims, and the Court does not reach Defendants' arguments ... addressing Plaintiffs' standing, class certification, and failure to state a claim. The Parties may raise these issues in additional pleadings."

In a letter to the parties, we had expressed some concern over our jurisdiction because the order was not one that technically denied a motion to compel arbitration, one of the grounds for interlocutory appeal set out in section 16 of the Federal Arbitration Act, 9 U.S.C. § 16. See Tex. Civ. Prac. & Rem. Code Ann. § 51.016 (West 2015) (permitting an appeal "under the same circumstances that an appeal from a federal district court's order or decision would be permitted by 9 U.S.C. Section 16.") The parties filed supplemental briefing at our request that allayed our concerns. See, e.g. , Del Valle Indep. Sch. Dist. v. Lopez , 845 S.W.2d 808, 809 (Tex. 1992) ("[I]t is the character and function of an order that determine its classification."); Beldon Roofing Co. v. Sunchase IV Homeowners' Assoc., Inc. , 494 S.W.3d 231, 236 (Tex. App.-Corpus Christi 2015, no pet.) ("Whether the order denies a motion to arbitrate is determined by the substance and function of the order and not its caption.").

In cases involving the FAA, Texas courts harmonize state and federal law where possible. See, e.g. , In re Weekley Homes, L.P. , 180 S.W.3d 127, 131 (Tex. 2005) (orig. proceeding) (applying state law and "endeavoring to keep it as consistent as possible with federal law").

But as we discuss later in this opinion, the Fifth Circuit is an outlier not because of any substantive disagreement with its sister courts but rather because of-and only because of-its rule against one panel's overturning a prior panel's decision. See Robinson v. J & K Admin. Mgmt. Servs., Inc. , 817 F.3d 193 (5th Cir.), cert. denied , --- U.S. ----, 137 S.Ct. 373, 196 L.Ed.2d 292 (2016).

The Supreme Court has more recently catalogued the things considered subsidiary, or procedural, and thus presumptively for arbitrators to rule on:
These procedural matters include claims of "waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp. , 460 U.S. 1, 25, 103 S.Ct. 927, 74 L.Ed. 2d 765 (1983). And they include the satisfaction of "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate." Howsam, supra , at 85, 123 S.Ct. 588 [further citations omitted].
BG Grp., PLC v. Republic of Argentina , 572 U.S. 25, 134 S.Ct. 1198, 1207, 188 L.Ed.2d 220 (2014).

The Concepcion Court also described some of the "obvious" "structural" differences between bilateral and class-action arbitration:
Classwide arbitration includes absent parties, necessitating additional and different procedures and involving higher stakes. Confidentiality becomes more difficult. And while it is theoretically possible to select an arbitrator with some expertise relevant to the class-certification question, arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification, such as the protection of absent parties.
Id. at 348, 131 S. Ct. at 1750. The Robinsons maintain that although Concepcion "discuss[ed] challenges relating to class arbitration ... it did not hold class arbitration was prohibited." The Concepcion Court was not, however, called upon to make such a holding one way or another.

Rule 7(a) of the AAA's commercial-arbitration rules currently provides that the arbitrator has the power to "rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Commercial Arbitration Rules and Mediation Procedures R. 7(a) (Am. Arb. Ass'n 2016), https://www.adr.org/sites/default/files/Commercial% 20Rules.pdf (accessed Apr. 16, 2018). This Court has recognized the majority view that, in general, an arbitration agreement's express incorporation of AAA Commercial Arbitration rules, including Rule 7(a), "clearly and unmistakably evidences the parties' intent to delegate issues of arbitrability to the arbitrator." Haddock v. Quinn , 287 S.W.3d 158, 172 (Tex. App.-Fort Worth 2009, pet. denied) (collecting cases but nevertheless noting that "the majority view does not 'mandate that arbitrators decide arbitrability in all cases where an arbitration clause incorporates the AAA rules' "); see also Burlington Res. Oil & Gas Co. LP v. San Juan Basin Royalty Tr. , 249 S.W.3d 34, 41 (Tex. App.-Houston [1st Dist.] 2007, pet. denied) (concluding that the agreement's "mere reference" to AAA rules was not "clear and unmistakable evidence of the parties' delegation of issues of arbitrability to an arbitrator"). We recognize that both Haddock and Burlington Resources were decided before a 2013 amendment to Rule 7(a) added the phrase "or to the arbitrability of any claim or counterclaim," though Catamaran was decided with the current version squarely in mind. Nonetheless, the Robinson-HOME agreement does not incorporate AAA rules, and so cases that have relied on AAA Rule 7(a) as delegating arbitrability issues to an arbitrator do not apply in any event.

See, e.g. , In re Pilgrim's Pride Corp. , 690 F.3d 650, 663 (5th Cir. 2012) ("In this circuit, we abide by the rule of orderliness. Under this rule, a panel of three judges may not unilaterally overrule or disregard the precedent that has been established by our previous decisions. In order for one panel to overrule another, there must be 'an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or by our en banc court.' " (citations omitted) ).

Of course, we would not be bound to follow the Fifth Circuit in any event; we give it no more deference than we do any other federal intermediate appellate or district court on issues of federal law. See Penrod Drilling Corp. v. Williams , 868 S.W.2d 294, 296 (Tex. 1993) ; Mohamed v. Exxon Corp. , 796 S.W.2d 751, 753-54 (Tex. App.-Houston [14th Dist.] 1990, writ denied).

The Ninth Circuit has issued an unpublished opinion to the same effect. See Eshagh v. Terminix Int'l Co., L.P. , 588 Fed. Appx. 703, 704 (9th Cir. 2014) (affirming district court order striking class allegations and compelling bilateral arbitration on the basis that the availability of class arbitration is a gateway issue for the court).

The supreme court has cited Wood relatively recently, in a case involving the effect of a contractual deadline for initiating arbitration, finding that an arbitrator should resolve the contracting parties' dispute over the deadline's effect. G.T. Leach Builders, LLC v. Sapphire V.P., LP , 458 S.W.3d 502, 522 (Tex. 2015). The G.T. Leach Court used Wood simply as an example of "who decides" without discussing, much less ruling on, its substantive soundness in light of later federal class-arbitration jurisprudence. See ids="6875733" index="146" url="https://cite.case.law/sw3d/458/502/#p522">id.